UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DORIAN KEARNEY,<br><br>                    Plaintiff,<br><br>          v.<br><br>WYNDHAM VACATION OWNERSHIP, INC.,<br><br>                    Defendant. | ECF CASE<br><br>No.: _____<br><br><br>COMPLAINT<br><br>JURY TRIAL DEMANDED |

## NATURE OF THE ACTION

1.      Plaintiff Dorian Kearney ("Plaintiff") asserts claims of disability-based discrimination, failure to accommodate and retaliation under the New York State Human Rights Law ("NYSHRL") and New York City Human Rights Law ("NYCHRL") against his former employer, Defendant Wyndham Vacation Ownership, Inc. ("Defendant").

2.      Plaintiff alleges that Defendant willfully and knowingly violated the NYSHRL and NYCHRL by failing to accommodate his disability, harassing and retaliating against him for having a disability, and by ultimately wrongfully terminating his employment in retaliation.

## JURISDICTION AND VENUE

3.      This Court has subject matter jurisdiction over this matter under 28 U.S.C. § 1332(a)(1), as this action is between citizens of different States and the amount in controversy exceeds $75,000.

4.      Venue is proper under §1391(b)(2) as a substantial part of the events giving rise to the claims occurred in this District: Defendant employed, discriminated against, and wrongfully terminated Plaintiff in New York, New York.

-1-

## THE PARTIES

5.      Plaintiff was and is, at all relevant times, an adult individual residing in Newark, New Jersey.

6.      Wyndham Vacation Ownership, Inc. was and is, at all relevant times, a foreign business corporation, organized and existing under the laws of the State of Florida, and authorized to do business in the State of New York, with its principal place of business at 6277 Sea Harbor Drive, Orlando, Florida 32821.

## STATEMENT OF FACTS

7.      On or about April 2014, Plaintiff started working as a Sales Executive for Defendant, at its New York City office, located at 205 E 45th St, New York, NY 10017.

8.      While Defendant employed him, Plaintiff generally worked five days per week, which generally amounted to over 40 hours of work per week.

9.      Shortly after beginning to work for Defendant, Plaintiff started experiencing a physical disability in the form of severe gastrointestinal symptoms, including, but not limited to, severe nausea and vomiting spells.

10.      Generally, Plaintiff experienced intense but not prolonged nausea spells in the beginning of his workday, which forced him to go to the restroom for approximately 3 to 15 minutes to settle his stomach and recover. After the nausea spell would pass, Plaintiff was able to return to work and continue working without further symptoms for the rest of the day.

11.      Plaintiff's gastrointestinal issues impaired his body that prevents the exercise of normal bodily function.

12.      Despite his disability, during his employment with Defendant, Plaintiff was a high performer who was promoted to Senior Sales Executive and received the Wyndham

-2-

Tiffany Awards and Wyndham Empire Club Awards for outstanding sales performance several times, as well as Wyndham Championship Award for outstanding performance.

13.    Defendant also recognized Plaintiff as the Second Place winner of the Sales Representative of the Year Award in or about 2015.

14.    Plaintiff's coworkers and supervisors became aware that Plaintiff was dealing with a noticeable and obvious disability almost as soon as it started happening because his coworkers and management would encounter and observe him throwing up and feeling nauseous in the men's restroom.  Such encounters happened for a period of over a year and a half, while Defendant employed him until wrongfully terminating him in or about November 2016.

15.    As Plaintiff continued to experience symptoms for a prolonged period of time, he was referred to specialist doctors and was required to take occasional days off of work to attend medical appointments to diagnose his condition. Defendant was put on notice and had full knowledge that Plaintiff was dealing with a persisting gastrointestinal condition because Plaintiff informed his superiors and HR and provided them several doctors' notes and FMLA paperwork specifying his condition.

16.    Despite Plaintiff's ailment being known and obvious to his coworkers and supervisors, Defendant failed to engage in the interactive process to accommodate Plaintiff. Defendant, instead, began to discriminate against him for having a disability.

17.    Sometime in 2015, Plaintiff started getting written up for being late to work: when he would timely come to work but had to go to the bathroom to take care of his disability.

18.    During one write up, Plaintiff informed one of his managers, either Jason Gill ("Manager Gill") or Ron Horton ("Mr. Horton"), that he was experiencing

gastrointestinal issues and that he was not late to work but was simply sick in the bathroom. Despite this, the manager still wrote Plaintiff up for lateness.

19.     On another occasion, Manager Gill told Plaintiff to contact HR about his disability. Plaintiff followed those instructions and contacted HR in or about September 2015 and informed them that he is looking for help in dealing with his disability symptoms at work.

20.     Despite not requesting to go on medical leave, but simply trying to find a solution where Defendant would not penalize Plaintiff for his disability symptoms at work, in response to Plaintiff's request, on September 24, 2015, Jennifer Hutt ("Ms. Hutt") from Defendant's HR, emailed Plaintiff FMLA paperwork to fill out.

21.     In the email, Ms. Hutt told plaintiff that the "paperwork is important because it will protect [him] during the times [he is] absent from work due to medical reasons or appointments," confirming Defendant was aware that Plaintiff was seeking an accommodation for his disability symptoms as early as September 2015.

22.     In about October 2015, Plaintiff requested Dr. Vitt, the primary care doctor who had seen him for his disability symptoms several times before, to fill out the FMLA paperwork. Dr. Vitt filled out the paperwork on or about October 8, 2015.

23.     Shortly after, Plaintiff brought the completed FMLA paperwork to Manager Gill, who told Plaintiff to give the paperwork to Ms. Hutt. Almost immediately, Plaintiff handed the completed FMLA paperwork to Ms. Hutt, who accepted the paperwork and told Plaintiff that she will take care of it and fax the paperwork to Leave Support Center.

24.     Plaintiff observed Ms. Hutt walk down the hall to the fax machine to purportedly fax the FMLA paperwork.

25.     The FMLA paperwork submitted to Defendant detailed the frequency of Plaintiff's symptoms and doctor's visits, the fact that he was referred to several specialists for treatment, including a gastroenterologist and a radiologist for examination, and that the issue was ongoing. The paperwork also specified that there was no job functions that Plaintiff could not perform.

26.     Despite being again put on notice of his disability, Defendant failed to do anything to help Plaintiff, let alone engage into the interactive process with Plaintiff in order to accommodate him.

27.     Plaintiff continued seeking help from Defendant in connection with his disability when he spoke to his managers and occasionally to the Director of Sales, Michael Odwyre, about the issues he was facing with his health and how it was causing Plaintiff to get undeserved late write ups.

28.     Defendant continued to systematically ignore its duty to accommodate Plaintiff's disability and continued to penalize him for having to excuse himself to the restroom.

29.     Defendant not only wrote Plaintiff up for being late on the days when he was not, but also placed Plaintiff on what is called an "overage" when he was nauseous or vomiting in the bathroom: an "overage" is what Defendant calls a period of time, usually an entire day, when Defendant penalizes a late sales representative by not allowing him to take any new clients during that day, unless there is an overflow of clients and all other sales representatives are busy at the same time, which happened extremely infrequently. As such, an employee on "overage" cannot meet with a client and therefore cannot generate any income or sales numbers.

30.     When Defendant placed him on "overage," Plaintiff had to spend an entire day in the office and was not allowed to do any work or earn any income. To further punish him, Defendant did not allow Plaintiff to leave the office until the end of the work day and only after a manager had excused Plaintiff from being on "overage."

31.     Defendant's discriminatory treatment of him caused severe anxiety and feeling of shame, and prevented Plaintiff from making sales and earning commissions, resulting in significant loss of income for Plaintiff during his employment with Defendant.

32.     During his employment with Defendant, Plaintiff earned approximately $60,000 per year. Plaintiff's income could have been meaningfully higher, closer to $100,000 per year, had Defendant not discriminated against him, by, included but not limited to, putting him on "overage."

33.     Plaintiff tried to avoid being placed on "overage" by openly communicating with his coworkers and managers about the fact that he needs to excuse himself to go to the restroom for a few minutes before the start of the work day. However, Defendant placed Plaintiff on "overage" for the entire day, even when they knew that he was at work on time but had gone to the restroom to take care of his disability symptoms and even when he was only 1 to 5 minutes late to start his work day.

34.     Defendant rarely imposed this rule on other employees, doing so only in extreme circumstances.

35.     Defendant further discriminated against Plaintiff when Plaintiff's manager, Mr. Horton, informed him of a new policy: that Plaintiff was required to bring doctors' notes before he can return to work. Specifically, Defendant began sending Plaintiff home and did not allow him to return to work until he had a note from the doctor explaining any

sick day he took off due to his illness, despite the fact that Plaintiff had submitted the FMLA paperwork and doctors' notes for an ongoing illness.

36.     Plaintiff informed Mr. Horton and other management officials that to get a doctor's note for a previously missed day of work, he sometimes had to wait several days to get a doctor's appointment, which resulted in more days of work he was forced to miss despite being ready and available to work.

37.     Defendant ignored Plaintiff's reasoning and refused to allow him to return to work without a doctor's note, requiring that he make a new doctor's appointment every single time he had an unpredictable or more severe flare up of his symptoms.

38.     Plaintiff, once, had to wait three to four days to see a doctor to get a note so Defendant would allow him to return to work.

39.     Defendant humiliated Plaintiff by sending him home on several occasions when he reported to work without a doctor's note after taking a sick day or being late.

40.     During the days Plaintiff was not allowed to return to work, Plaintiff lost income and suffered emotional distress and anxiety for being penalized for his disability.

41.     His sales ranking fell because he was forced to miss work, which resulted in Defendant not assigning him as many clients as before, further costing Plaintiff lost business opportunities and income.

42.     Some of Plaintiff's coworkers also informed Plaintiff that management was making negative comments about his disability. For instance, Plaintiff was told that at one meeting, where Plaintiff was getting recognized and was supposed to receive a small bonus for meeting and exceeding a sales challenge the day before, but at which time Plaintiff was sick in the bathroom and coworkers and management was aware of this, a sales manager, Mr. Washington, after announcing Plaintiff's achievement made a joke about Plaintiff's

disability, by saying; "look he thinks he is that much of big shot, can't even show up to receive his money." Plaintiff later approached Mr. Washington and told him that he was in the bathroom because of his disability, however he was once again punished by being placed on "overage" for the entire day and his earned bonus was taken away from him.

43.     Several months after Plaintiff submitted the FMLA paperwork, Defendant's new HR Manager, Jennifer [last name unknown] ("HR Manager") confronted Plaintiff about his medical absences and lateness. Plaintiff told the HR Manager that he had been "protected" by the FMLA paperwork he submitted in October 2015, as was promised and explained to him by Ms. Hutt, who handled the paperwork and faxed it to the Leave Support Center.

44.     The HR Director told Plaintiff that Defendant did not receive his FMLA paperwork in October 2015, and his absences and medically-related lateness are not acceptable or excusable.

45.     The HR Director proceeded to write up Plaintiff for being late or absent because of his disability on more than two occasions.

46.     During such write ups, Plaintiff inquired why he is not protected and what happened to the FMLA paperwork and sought help on how to obtain permission not to be penalized further for his condition. Plaintiff also voiced his desire to continue working and told Defendant that he did not want to miss more work because of Defendant's new policies, requiring him to get doctor's notes every time he is late or took a sick day, as it was costing him sales ranking and income. Defendant failed to explain to Plaintiff what happened to his FMLA paperwork and actively avoided finding a solution to his disability predicament.

47.     On at least one occasion, Plaintiff refused to sign a disciplinary notice that he got from Defendant for medically-related lateness or absence, because he did not agree that the disciplinary action was unexcused since it was incurred due to his disability.

48.     Eventually, the HR Director told Plaintiff he has to submit new FMLA paperwork from his doctor, but this time he had to submit it to Matrix Absence Management ("Matrix"), working on behalf of Defendant. Plaintiff once again complied and submitted the paperwork to Defendant.

49.     Several months later, on or about October 12, 2016, Plaintiff received a letter from Matrix informing him that his FMLA leave, from January 1, 2016 to September 26, 2016, had been denied because Plaintiff had purportedly "failed to provide timely notice of your need for leave."

50.     Plaintiff informed his management and HR, that he was not seeking medical leave, but was seeking a solution that would allow him to continue working without being penalized for lateness by being placed on "overage," or being sent home and not allowed to return to work without doctor's notes. Defendant, in return, avoided answering Plaintiff's concerns and did not give him any further instructions besides telling him to call Matrix about FMLA leave.

51.     Defendant did not engage in any reasonable interactive process to accommodate Plaintiff's continual concerns and requests to allow him to continue working without being retaliated against.

52.     On one Saturday in November 2016, when Plaintiff came into work, he was wrongfully terminated by sales director, Michael Odwyre, in the presence of Manager Horton and the HR Director, for purported insubordination for refusing to sign a

disciplinary notice against him and for unexcused lateness – all of which is connected to his disability.

53.     As a further result of Defendant's callous and unlawful conduct, Plaintiff lost his income and his home, becoming homeless with no place to live since November 2016.

54.     Defendant caused Plaintiff to suffer and he continues to suffer, among other items, impairment and damage to his good name and reputation, emotional distress, mental anguish, emotional pain, suffering, inconvenience, loss of enjoyment of life, and lasting embarrassment and humiliation.

55.     Defendant failed to provide Plaintiff with the Notice and Acknowledgment of Payrate and Payday under N.Y. Lab. Law § 195.1 when he was hired or at any point in his employment.

FIRST CAUSE OF ACTION<br>
DISABILITY DISCRIMINATION<br>
UNDER THE NEW YORK STATE HUMAN RIGHTS LAW

56.     Plaintiff repeats and realleges each and every allegation of the preceding paragraphs as if fully set forth herein.

57.     At all relevant times, Plaintiff was an "employee" and "person" under the NYSHRL.

58.     At all relevant times, Defendant was an "employer" under the NYSHRL.

59.     Plaintiff's gastrointestinal ailments, including severe nausea and vomiting spells, constitute disabilities under the NYSHRL, N.Y. Exec. Law §§ 292(21)(a)-(c).

60.     Plaintiff's requests to not be penalized for needing to take 3 to 15 minutes to go to the restroom, to be allowed to attend doctor's visits, and to be allowed to return

back to work without further obstacles after needing a sick day, are reasonable accommodations under the NYSHRL.

61.     With the requested reasonable accommodations, Plaintiff could have performed the essential functions of his job.

62.     Plaintiff's disability was obvious, noticeable and witnessed by Defendant and its management. Plaintiff also submitted medical paperwork and directly informed Defendant of his disability on numerous occasions.

63.     Defendant was on notice of Plaintiff's disabilities, requested accommodation and failed to provide such accommodation by continuously penalizing him for having a disability and imposing new rules on Plaintiff, such as the request to bring in a doctor's note before being allowed to return back to work.

64.     In failing to provide a reasonable accommodation to Plaintiff's known disability and for failing to engage in a good faith interactive process, Defendant violated the NYSHRL. N.Y. Exec. Law §§ 296(1)(a) and 296(3)(a).

65.     Instead of accommodating his disabilities, Defendant discriminated against Plaintiff, leading him to suffer emotional humiliation, distress and loss of income, and ultimately terminated his employment, further violating the NYSHRL.

66.     By terminating Plaintiff, Defendant violated the NYSHRL.

67.     FMLA leave is not an accommodation under the NYSHRL. Defendant's duties to engage in the interactive process and accommodate his disability exist separate and apart from its FMLA statutory obligations.

68.     As a result of Defendant's failure to accommodate his disability, Plaintiff has become homeless and has suffered and continues to suffer, inter alia, loss of wages,

emotional distress, mental anguish, emotional pain and suffering, inconvenience, loss of enjoyment of life and medical expenses.

SECOND CAUSE OF ACTION
DISABILITY DISCRIMINATION
UNDER THE NEW YORK CITY HUMAN RIGHTS LAW

69.    Plaintiff repeats and realleges each and every allegation of the preceding paragraphs as if fully set forth herein.

70.    At all relevant times, Plaintiff was an "employee" and "person" under the NYCHRL.

71.    At all relevant times, Defendant was an "employer" under the NYCHRL.

72.    Plaintiff's gastrointestinal ailments, including severe nausea and vomiting spells, constitute disabilities under the NYCHRL, N.Y.C. Admin. Code § 8-102(16)(a).

73.    Plaintiff's numerous requests to not be penalized for needing to take 3 to 15 minutes to go to the restroom, to be allowed to attend doctor's visits, and to be allowed to return back to work without further obstacles after needing a sick day, constitutes reasonable accommodations under the NYCHRL.

74.    In failing to provide a reasonable accommodation to Plaintiff's known and obvious disabilities and for failing to engage in a good faith interactive process, Defendant violated the NYCHRL. N.Y.C. Admin. Code §§ 8-107(1)(a), 8-107(15)(a).

75.    Instead of accommodating his disabilities, Defendant discriminated against Plaintiff, leading him to suffer emotional humiliation, distress and loss of income and ultimately terminated his employment, further violating the NYCHRL.

76.    By terminating Plaintiff, Defendant violated the NYCHRL.

77.     FMLA leave is not an accommodation under the NYCHRL. Defendant's duties to engage in the interactive process and accommodate his disability exist separate and apart from its FMLA statutory obligations.

78.     As a result of Defendant's failure to accommodate his disabilities, Plaintiff has become homeless and has suffered and continues to suffer, *inter alia*, loss of wages, emotional distress, mental anguish, emotional pain and suffering, inconvenience, loss of enjoyment of life and medical expenses.

THIRD CAUSE OF ACTION
FAILURE TO PROVIDE 195.1 NOTICE
UNDER THE NEW YORK LABOR LAW

79.     Plaintiff repeats and realleges each and every allegation of the preceding paragraphs as if fully set forth herein.

80.     Defendant has willfully failed to supply Plaintiff with the required Notice and Acknowledgement of Pay Rate and Payday under NYLL § 195.1(a) within ten business days of its first employment date.

81.     Due to Defendant's violations of Labor Law § 195.1, Plaintiff is entitled to recover from Defendant $50.00 for each work day that the violations occurred or continue to occur, or a total of $5,000.00, reasonable attorneys' fees, costs, injunctive and declaratory relief. New York. Lab. Law § 198(1)-b (2016).

PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests this Court grant the following relief:

1.     Accepts jurisdiction over this matter.

2.     Impanels and charges a jury with respect to the causes of action.

3.     Awards Plaintiff the following damages against Defendant:

        a.     An award of front pay, back pay, and all benefits;

    b.  Damages for pain and suffering, anxiety, humiliation, loss of enjoyment of life, physical injury and emotional distress, and medical expenses in order to compensate him for the injuries he has suffered and to signal to other employers that discrimination, harassment and retaliation are repulsive to legislative enactments in the amount of at least $1,000,000.00;

    c.  An award of punitive damages;

    d.  An award of for failing to provide the N.Y. Lab. Law § 195.1 Notice;

    e.  An award of pre-judgment and post-judgment interest;

    f.  An award of costs and expenses of this action together with reasonable attorneys' and expert fees, if any; and

    g.  Such other and further relief as this Court deems just and proper.

<u>DEMAND FOR TRIAL BY JURY</u>

  Pursuant to Fed. R. Civ. P. 38(b), Plaintiff demands a trial by jury on all questions of fact the Complaint raises for which the applicable statues provide for a trial by jury.

Dated: New York, New York
   January 23, 2019

       LIPSKY LOWE LLP


       <u>s/ Douglas B. Lipsky</u>
       Douglas B. Lipsky
       Christopher H. Lowe
       Milana Dostanitch
       630 Third Avenue, Fifth Floor
       New York, New York 10017-6705
       Tel: 212.392.4772
       Fax: 212.444.1030
       chris@lipskylowe.com
       doug@lipskylowe.com
       milana@lipskylowe.com